IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**INTEGRATED GLOBAL**
**SERVICES, INC.**

    **Plaintiff,**

v.                                                        Civil Action No. 3:17cv563

**MICHAEL MAYO,**

    **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff Integrated Global Services, Inc.'s ("IGS") Motion for Preliminary Injunction. (ECF No. 4.) On August 22, 2017, Mayo filed a "Brief in Support for Expedited Hearings" with nine exhibits. (ECF No. 22.) On August 25, 2017, the Court held a hearing at which it took evidence and heard oral argument, and the matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] Mayo appeared *pro se*.[2] The day of the hearing, the Court entered an Order granting the Preliminary Injunction. (ECF No. 19.) This Memorandum Opinion sets forth the reasoning for the Court's ruling.

## I. Factual and Procedural Background

### A. Procedural History

On August 10, 2017, IGS filed its Verified Complaint against Defendant Michael Mayo, (ECF No. 1), the Motion for Preliminary Injunction, (ECF No. 4), and a Motion to Expedite

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Verified Complaint alleges violations of, *inter alia*, the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831, *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.*

[2] On September 1, 2017, attorney Zev Hillel Antell appeared on Mayo's behalf in this proceeding. Thus, while Mayo appeared *pro se* at the Preliminary Injunction Hearing, it appears that he now has counsel.

Discovery, (ECF No. 6).[3] Mayo was personally served with summons and a copy of the Verified Complaint on August 11, 2017, and on August 15, 2017, IGS filed a Motion for Expedited Hearing on its Motion for Preliminary Injunction.[4] On August 16, 2017, the Court held a conference call at which counsel for IGS and Mayo, proceeding *pro se*, appeared. The Court set an expedited briefing schedule on the Motion for Preliminary Injunction and the Motion for Expedited Discovery, and scheduled a hearing on the Motion for Preliminary Injunction. On August 22, 2017, Mayo filed a "Brief in Support for Expedited Hearings" with nine exhibits. (ECF No. 22.) On August 23, 2017, IGS filed a copy of its Witness and Exhibit Lists for the Preliminary Injunction Hearing, (ECF No. 15), and a Motion to Seal Exhibits,[5] (ECF No. 13). On August 24, 2017, IGS filed a Motion to Seal the Courtroom and Transcript.[6] (ECF No. 16.)

Mayo filed the above-referenced collection of "exhibits," cross-examined witnesses, and presented some argument during the hearing. Eventually, however, he decided not to testify or otherwise present evidence to the Court during the hearing, even though the Court made clear that Mayo's earlier-filed "exhibits" would not be considered in its ruling on the Motion for

---

[3] The Court ruled on the Motion to Expedite Discovery in a separate Memorandum Order. (ECF No. 18.)

[4] IGS represented to the Court that it had served copies of the Motion for Preliminary Injunction and the Motion for Expedited Discovery on Mayo, but only the Motion for Expedited Hearing, (ECF No. 9) contains a certificate of service stating that Mayo was served with a copy of that motion. (*See* Mot. Expedited Hr'g 5, ECF No. 9.)

[5] The Court granted IGS's Motion to Seal Exhibits, (ECF No. 13), from the bench during the hearing.

[6] The Court also granted in part IGS's Motion to Seal the Courtroom and Transcript, (ECF No. 16), from the bench during the hearing. As the Court stated during the hearing, after the transcript is filed, IGS may move to redact those portions of the transcript IGS believes contain proprietary information or trade secrets.

Preliminary Injunction unless Mayo presented them in a manner that complied with the Federal Rules of Evidence.

B. **Factual Findings**[7]

Mayo was employed with IGS as a "Mechanical Product Manager-Paper" from 2010 until June 21, 2017. (Compl. ¶ 15.) In that capacity, Mayo "oversaw projects," "evaluated the scope of the work IGS was asked to perform for customers and prospective customers, attended pre-bid meetings, and worked with IGS's sales department to develop project estimates, bids and proposals." (*Id.* ¶ 16.) He also managed projects "worth as much as $5,000,000.00" and supervised crews of up to one hundred workers. (*Id.*) In the course of his work, Mayo had extensive interactions with IGS customers, and "had access to IGS's key contacts for and relationships with" these customers, (*Id.* ¶ 20). Importantly, he also "had access to IGS's highly sensitive, confidential, proprietary[,] and trade secret information," including the "technical, engineering, sales, customer, budget, manpower, and cost and pricing information" for IGS projects for a variety of customers. (*Id.* ¶ 18.) IGS provided Mayo with a password-protected laptop computer and a smartphone "to use in connection with his employment for IGS." (*Id.* ¶ 28.)

On August 26, 2010, approximately three months after he began working for IGS, Mayo executed an "Employee Proprietary Information, Inventions, Non-Solicitation[,] and Non-Competition Agreement" (the "Confidentiality Agreement"). (*Id.* ¶¶ 23–24.) The Confidentiality Agreement governs, *inter alia*, nondisclosure of company information and return

---

[7] "The facts set forth here are merely *preliminary facts* and do not represent factual findings for any purpose other than the resolution of the instant motion." *Pro-Concepts LLC v. Resh*, No. 2:12cv573, 2013 WL 5741542, at *1 n.1 (E.D. Va. Oct 22, 2013).

3

of company documents. (Confidentiality Agreement 1, 3, ECF No. 1-1.) The section governing nondisclosure provides, in part:

> At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose or use any of the Company's Proprietary Information . . . , except as such disclosure or use may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. . . . I have been informed and acknowledge that the unauthorized taking of the Company's trade secrets may subject me to civil and/or criminal penalties.

(*Id.* at 1.) "Proprietary Information" is defined in the Confidentiality Agreement as

> any and all confidential and/or proprietary knowledge, data[,] or information of the Company. . . . [and] includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvement, discoveries, developments, designs and techniques . . . ; and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers.

(*Id.*) The Confidentiality Agreement expressly provided that Mayo was free to "use information which is generally known in the trade or industry, or which is not gained as result of a breach of" the Confidentiality Agreement." (*Id.*) The Confidentiality Agreement further required that, upon leaving IGS's employment, Mayo would "deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information, or Proprietary Information of the Company." (*Id.* at 3.)

IGS terminated Mayo's employment on June 21, 2017, but not until the afternoon of July 19, 2017—nearly one month later—did Mayo return the company laptop and computer to Rich Crawford, IGS's Chief Executive Officer, and he did so "only after IGS demanded their return." (Compl. ¶ 32.) After Mayo returned the computer and phone, IGS learned that the phone "had been reset to its original factory settings, thereby erasing all of the data created during Mayo's use." (*Id.* ¶ 33.) Crawford testified at the August 25, 2017 hearing that, even before the July 19,

4

2017 meeting, he was becoming "very concerned." Crawford testified that IGS had repeatedly asked Mayo to return the computer and phone, and, given Mayo's delay in doing so, Crawford began to believe that Mayo might use IGS's proprietary information while working for someone else. Crawford also testified that he had heard reports that Mayo was communicating and meeting with IGS competitors just after being laid off by IGS. Given Mayo's delay in returning his computer and phone, Crawford's misgivings, and the "apparent deletion of information from the smartphone, IGS had Mayo's computer forensically examined" by J. Christopher Racich, an expert in computer forensic analysis.

Racich began a forensic examination of the computer on July 21, 2017, two days after Mayo had returned the computer to IGS. The purpose of Racich's examination was to "determine to the extent possible whether Mayo attached any external storage devices to the . . . [l]aptop, copied data to external sources, accessed IGS information, or deleted or otherwise overwr[ote] files or otherwise acted inappropriately after the end of his employment with IGS." (Racich Decl. ¶ 8.) Racich's examination revealed the following activity on the laptop that occurred after Mayo's employment was terminated:[8]

   (1)   "[O]n June 23, 2017, at approximately 2:00 p.m. EST, a PNY USB 2.0 Flash Drive with the ID number of 1101310565D0AD74&0 was for the first time attached to the" computer, (*id.* ¶ 10);

   (2)   Also on June 23, 2017, the computer was used to access files existing on the removable device entitled "E:\Unbrella Scaffolding\Digester Scaffold arm 14 foot D.pdf" and "E:\Unbrella Scaffolding\Umbrella Scaffold 12ft 3in.pdf," (*id.*);

---

[8] Racich also testified extensively and in detail about his analysis of the laptop and the conclusions he drew from the data he retrieved. Racich's testimony, to a material degree, comported with the statements in his declaration.

(3) After June 21, 2017, the computer was used to access folders on the local computer entitled "Paragon Dakota Gas July 2016.xlsx," "Paragon Dakota Gas Quote July 2016.pdf," "Black Hills Power - Wygen LPA Screen Proposal Rev 1a - Jeff.pdf," "SRIESTIMATINGTEMPLATE.xls," and "AirHeater.xlsx," (*id.* ¶ 13);

(4) At some point, the computer was used to access "cached versions of file[s] existing on the IGS Network Server" in folders entitled "\\igs-fp\userfolders\Mike Mayo\Air Heater Projects 2016," "\\igs-fp\userfolders\Mike Mayo\Air Heater Projects 2016," and "\\igs-fp\userfolders\Mike Mayo\LPA Screens Black Hills Power Wygen 1 2016," (*id.* ¶ 14);

(5) On or after June 21, 2017, "there was a Google search for 'hoe [sic[ to save my contacts without iCloud'" performed on the computer, (*id.* ¶ 15);

(6) Finally, between 10:19 a.m. and 10:39 a.m. on July 19, 2017 (the day that Mayo met with Rich Crawford and returned the computer and phone), "more than 2,500 files were accessed and deleted" from the laptop, (*id.* ¶ 16).

Racich affirms that, although his analysis revealed "data that ha[d] been definitely opened by the user on external devices," but might not be "a complete list of all data that was copied," and the best way to determine the data copied "would be to gain physical access to the actual external device for forensic examination." (*Id.* ¶ 12.) Racich testified that he was presented with a document that, to a reasonable degree of certainty, was a printout containing a list of the files present on the USB Drive on August 10, 2017. That printout—twenty-five pages long—indicated that the USB Drive contained approximately 250 documents containing IGS's confidential, proprietary and trade secret information, including documents related to IGS's projects for Paragon Gas, Boise Jackson and Black Hills Power.

Crawford testified that these documents contained information relating to ongoing IGS projects including pictures, diagrams, production rates, contact information for customers and employees, service agreements, and customer proposals. At least two of the documents were spreadsheets from which IGS would calculate its project costs and its profit margins, both of

which were created based on years of IGS experience in the industry. Crawford attested that these documents were confidential, provided a competitive advantage to IGS, and would be harmful to IGS in the hands of a competitor. Crawford testified that the documents on the USB Drive constituted "the most important information for [Mayo's] largest accounts." Crawford further identified specific steps IGS took to prevent this information from being disclosed to the public, including having all of its employees and many of the companies for whom it performed work execute non-disclosure agreements; limiting the dissemination of this information with IGS to only those individuals who needed to know the information to perform their job functions; and, marking information as "confidential."

Crawford also confirmed that the information in the project folders that had been deleted contained IGS's confidential, proprietary and trade secret information regarding proposals, rates, estimates and sensitive postproject technical reports, and that for at least some of the documents, IGS does not have other copies. Some documents existed only on Mayo's computer because they related to work completed on job sites in the last couple months that had not yet been copied to another IGS drive. Crawford testified that losing those documents would cause IGS significant damage and that some, but not all, of the information could only be recreated at significant expense to IGS. Moreover, according to IGS, Mayo's deletion of those documents "has deprived IGS of valuable information" and prevented it from determining "earlier activity, including whether Mayo copied the documents before he deleted them." (Compl. ¶ 48.)

IGS also alleges that, after Mayo was laid off by IGS, he "secured employment with a direct competitor of IGS." (*Id.* ¶ 53.) IGS asserts, "[u]pon information and belief, [that] during the week of July 12, 2017, Mayo met with one of IGS's direct competitors, to discuss possible employment," and on July 19, 2017, Mayo "indicated to Mr. Crawford that he intended to work

for a direct competitor." (*Id.* ¶ 50.) IGS alleges that "Mayo already has disclosed and/or used IGS's confidential, proprietary[,] and trade secret information," (*Id.* ¶ 56), and that, "[u]pon information and belief, Mayo and the competitor(s) with which Mayo communicated about his employment acted in concert and with the intent for Mayo to disclose IGS's confidential, proprietary and trade secret information and to use such information to compete with IGS," (*Id.* ¶ 54.) Crawford testified that Mayo had told him that Mayo intended to work for an IGS competitor, and that Crawford had heard "rumblings" that Mayo was meeting with competitors. Mayo presented no evidence to rebut this information.

On July 26, 2017, IGS sent Mayo a letter requesting that Mayo produce the USB drive and return to IGS all other property related to IGS's business. After several communications back and forth, IGS received, through counsel for Mayo, a forensic analysis of the USB Drive. The forensic analysis "revealed that, on July 7, 2017, Mayo copied to the USB Drive approximately 250 documents containing IGS's confidential, proprietary and trade secret information, including documents related to IGS's projects for Dakota Gas, Boise Jackson and Black Hills Power," (*Id.* ¶ 65), and that, before returning the computer to IGS, "Mayo deleted from the computer some, if not all, of the documents he copied to the USB Drive," (*Id.* ¶ 66). "The forensic analysis further confirmed that Mayo copied IGS's confidential, proprietary and/or trade secret information while taking steps to secure employment with and while working for a direct competitor of IGS." (*Id.* at 68.)

According to IGS, Mayo still has not complied with its requests that he return IGS's "confidential, proprietary[,] and trade secret information," nor provided an explanation for why he accessed, copied, or deleted that information. (*Id.* ¶ 70.) IGS avers that

> [i]f the Court does not enjoin Mayo's continued misappropriation and use of its information, IGS will lose business, goodwill, customers and its competitive

advantage in the market in which it does business. Because of the critical nature of the information Mayo stole, Mayo's actions have the potential to damage IGS's overall business operations permanently and irreparably.

(*Id.* ¶ 73.) IGS seeks "a temporary restraining order, a preliminary injunction[,] and permanent relief." (*Id.* ¶ 75.)

IGS's Complaint asserts seven counts against Mayo:

| | |
|---|---|
| **Count I:** | Misappropriation of Trade Secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831, *et seq.*; |
| **Count II:** | Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336, *et seq.*; |
| **Count III:** | Breach of Contract; |
| **Count IV:** | Conversion; |
| **Count V:** | Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.*; |
| **Count VI:** | Breach of Fiduciary Duty; and, |
| **Count VII:** | Violation of the Virginia Business Conspiracy Act, Va. Code § 18.2-499. |

IGS seeks compensatory and punitive damages, pre- and post-judgment interest, and attorneys' fees. IGS also seeks an order requiring Mayo to:

(1) Deliver IGS's documents in Mayo's possession, custody, and control to counsel for IGS within twenty-four hours with a signed representation that he no longer possesses any other IGS documents or information;

(2) Preserve all information currently stored on his computer or electronic storage devices;

(3) Provide a list of all computers to which he attached the USB drive at issue, or any other electronic storage devices containing IGS information;

(4) Comply with his obligations under the Confidentiality Agreement;

(5) Identify all persons to whom Mayo has disclosed IGS trade secrets or other confidential information;

9

IGS also seeks an order granting it the right to conduct an inspection of the USB drive at issue and any other electronic devices produced by Mayo that contain IGS information.

## II. IGS's Motion for a Preliminary Injunction

As discussed below, the Court finds that IGS has sufficiently established a likelihood of success on the merits of at least one of its claims, a likelihood of irreparable harm absent a preliminary injunction, and that the balance of hardships and public interest weigh in favor of granting the preliminary injunction.

### A.  Legal Standard: Preliminary Injunctions

"[A] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) ("*Perry II*") (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24. "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Comm'cns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Therefore, preliminary injunctions are "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

In order to be eligible for a preliminary injunction,[9] the party seeking such relief must demonstrate each of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest favors granting an injunction. *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v.*

---

[9] A decision to grant a preliminary injunction lies within the sound discretion of the district court. *Perry II*, 471 F. App'x at 223 (citation omitted).

*Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).[10] "The required irreparable harm must be neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotations and citations omitted).

IGS, as the party seeking a preliminary injunction, bears the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

### B. IGS Demonstrates a Likelihood of Success on the Merits of its Trade Secret Misappropriation Claim Under Virginia Law[11]

IGS presents evidence—in its Verified Complaint, in the Declaration of J. Christopher Racich, and in the evidence presented at the hearing—sufficient to establish a likelihood of success on Count II of its Complaint, misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336, *et seq.*

To establish trade secret misappropriation under the VUTSA, IGS must show: "(1) the existence of a 'trade secret'; and[,] (2) the 'misappropriation' of that trade secret by the defendant. *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d

---

[10] "Before the Supreme Court's decision in *Winter*, the standard articulated in *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), governed the grant or denial of preliminary injunctions in the Fourth Circuit." *Real Truth*, 575 F.3d at 346.

[11] Although IGS asserts seven claims against Mayo, the Court analyzes only IGS's likelihood of success on its trade secret misappropriation claim because the likelihood of success on that claim would justify the injunctive relief IGS requests. *See, e.g., Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1291 n.4 (M.D.N.C. Apr. 14, 1989).

771, 778 (E.D. Va. 2012) (quoting *MicroStrategy, Inc. v. Li*, 601 S.E.2d 580, 588 (Va. 2004)). A "trade secret" under the VUTSA is information that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[;] and[,]

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code. § 59.1-336. "Misappropriation" means, *inter alia*, "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of the trade secret." *Id.* "[T]heft, bribery, misrepresentation, *use of a computer or computer network without authority*, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" all constitute "improper means" under the VUTSA. *Id.* (emphasis added).

Whether something amounts to a trade secret, and whether a trade secret has been misappropriated, are both questions of fact. *MicroStrategy*, 601 S.E.2d at 264. Under the VUTSA, "[a]ctual or threatened misappropriation may be enjoined . . . [and] may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Va. Code § 59.1-337(A).

### 1. IGS Likely Can Establish that the Information at Issue Is Trade Secret Information

IGS likely will be able to establish that the information at issue is trade secret information. Information subject to trade secret protection is information that "ha[s] independent economic value as a result of not being generally known and not being readily ascertainable by

proper means" and for which reasonable efforts have been taken to maintain its secrecy. *MicroStrategy*, 331 F. Supp.2d at 416; Va Code. §59.1-336. The requirement that a trade secret "not be generally known refers to the knowledge of other members of the relevant industry—the persons who can gain economic benefit from the secret." *MicroStrategy*, 331 F. Supp.2d at 416 (citing VUTSA § 1, comment). "[J]ust about anything can constitute a trade secret under the right set of facts," including "a customer list[] or a method of selling or marketing." *Id.*

IGS has made a clear showing as to its likely ability to prove that the information at issue ""ha[s] independent economic value as a result of not being generally known and not being readily ascertainable by proper means." *Id.* Specifically, some of the documents that Mayo accessed, copied, and deleted include:

(1) "Digester Scaffold arm 14 foot D.pdf and Umbrella Scaffold 12ft 3in.pdf," which "are detailed schematics IGS created for building an umbrella scaffolding used in applying thermal coating to equipment in a pulp and paper mill," and was developed for IGS's exclusive use and is not available to the public, (Compl. ¶ 40);

(2) "3000 puller block.pdf," which is a "detailed drawing of a part on IGS's proprietary coating torch," and is one of "IGS's application methods [that] provide[s] it with a unique competitive advantage in the surface protection solutions market and make IGS a superior provider of metalspray coatings," (Compl. ¶ 41);

(3) "Paragon Dakota Gas July 2016.xlsx and Paragon Dakota Gas Quote July 2016.pdf," which are "a confidential estimate worksheet and proposal for a project for Paragon Gas," and include "confidential and trade secret information regarding the hours, manpower, equipment and materials for the project, as well as pricing, cost and planning and execution information" not known to the general public, and which would be "highly valuable to a competitor," (Compl. ¶ 42);

(4) "SRIESTIMATINGTEMPLATE.xls," which is an estimating template that "includes cost and pricing information, as well as estimating methods, which a competitor could use to compete with IGS on future projects," (Compl. ¶ 43);

(5) "IGS Inc Project List.xls," "IGS Inc Project List.xlsx," "IGS Inc Project List (2).xlsx," and "Job List for R-Stamp.xls," which are all "customer lists containing key contact and project information," (Compl. ¶ 44); and,

(6) "Va Power Proposal1.doc," "SRI Bid to CB - Roxboro - Progress Energy Project.pdf," "Tesoro - Mandan Refinery Project.pdf," and "Est3 Grit & Spray.xls," which are "IGS's confidential proposals and estimates," and " include IGS's confidential pricing, cost, planning and scheduling information," (Compl. ¶ 45).

Crawford competently and credibly testified to the confidential nature of each of these documents, the steps IGS took to prevent disclosure to the public, and the independent economic value that these documents have to IGS. Additionally, Mayo signed the Confidentiality Agreement, which governed his use and disclosure of trade secret information. His computer—on which the information at issue was stored—was password protected. Moreover, IGS clearly showed that much of the information Mayo copied and deleted was not available to the public.

Thus, the evidence shows that IGS likely will be able to establish that the information at issue is trade secret information.[12]

### 2. IGS Likely Can Establish that Mayo's Post-Employment Copying of the Information Qualifies as Misappropriation

IGS likely can establish that Mayo misappropriated trade secret information when he copied files from the IGS-provided computer after his employment with IGS had ended. Under the plain language of the statute, mere *acquisition* of a trade secret by the improper means listed

---

[12] Not all of the information Mayo copied after he was laid off constitutes trade secret information. For example, the forensic analysis revealed that Mayo accessed a document on the USB Drive entitled "Mayo Resume." (Ex. 3 to Racich Decl. 1, ECF No. 5-4.) It also shows that, among the files IGS believes Mayo deleted are numerous files in a folder entitled "Hunting Pictures." (Ex. 6 to Racich Decl. 85–86, ECF No. 5-7.) It is likely, based on the titles of these documents and folders, that they do not constitute trade secret information. But that some documents might be personal does not mean that others are not confidential. IGS has produced ample evidence, even at this very early stage, that many of the documents copied onto and then access from the USB drive *did* constitute trade secret information. (*See* Ex. 3 to Racich Decl. 1, ECF No. 5-4 (showing that someone accessed, from the USB drive, documents titled, *inter alia*, "Rates 2016 – Mech-GA," "Paragon Dakota Gas Quote July 2016," and "Air Heater Projects.")

14

in the statute is sufficient to establish misappropriation. Va. Code § 59.1-336 ("'Misappropriation' means: . . . *[a]cquisition* of a trade secret . . . ."); *see also Systems 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (applying identical language from the Maryland Uniform Trade Secrets Act and stating that "[i]f Systems 4 could demonstrate that Wallick acquired its proposal through improper means, it would be entitled to proceed on its misappropriation claim regardless of whether Landis actually used any of the trade secrets contained in the proposal."); *MicroStrategy*, 331 F. Supp. 2d at 417 n.3 (stating that the statue "seems clear" that "mere acquisition can constitute misappropriation under Virginia law"). IGS's unrebutted expert testimony that Mayo copied numerous files from his IGS-provided computer onto the USB drive after his employment with IGS ended clearly shows that IGS likely can prove that Mayo improperly acquired the trade secrets. As of June 21, 2017, Mayo no longer was employed with IGS, and thus had no legitimate reason to access—let alone *copy*—IGS's trade secret information.[13]

"Misappropriation also includes a *knowledge* element . . . ." *Softech Worldwide, LLC v. Internet Tech. Broadcasting Corp.*, No. 1:10cv651, 2010 WL 4645791, at *4 (E.D. Va. Nov. 8, 2010). Thus, to qualify as misappropriation, a person who improperly acquired a trade secret must "know[] or ha[ve] reason to know that the trade secret was acquired by improper means." Va Code. §59.1-336. IGS presented evidence clearly showing that it likely can prove the knowledge element. IGS presented evidence that Mayo signed the Confidentiality Agreement, which stated, among other things, that "[a]t all times during my employment and thereafter I will

---

[13] To the extent that Mayo possesses IGS's trade secrets simply by virtue of his past employment with IGS, that would not necessarily constitute misappropriation because Mayo would not have come into possession of those IGS trade secrets by the "improper means" outlined in the statute. In that situation, mere possession of the trade secrets would not violate the VUTSA, "[h]owever, should [Mayo] act on that trade secret, liability [could] result." *MicroStrategy*, 331 F. Supp. 2d at 417.

... not disclose or use any of the Company's Proprietary Information ..., except as such disclosure or use may be required in connection with my work for the Company ...." (Confidentiality Agreement 1.) Thus, even if Mayo contends that he did not *in fact* know, he at least *should have known* that there were restrictions on his use of the trade secret information,[14] and that its use was only permitted "in connection with [his] work for [IGS]." (*Id.*)

### C. IGS Demonstrates a Likelihood of Irreparable Harm Absent Injunctive Relief

IGS must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama*, 575 F.3d at 347. Irreparable injury generally is suffered "when monetary damages are difficult to ascertain or are inadequate." *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local* 275, 479 F.2d 1033, 1037 (2d Cir. 1973)). Moreover, "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 552. However, to satisfy the requirements for a preliminary injunction, irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and citation omitted).

IGS has made a sufficient showing that it faces "actual and imminent" irreparable harm without a preliminary injunction. *See Direx Israel*, 952 F.2d at 812. Through the admissible, relevant, and competent expert testimony of Racich, IGS presents evidence that Mayo deleted "in excess of 152 estimates and proposals[,] some of which contain information regarding IGS's

---

[14] During argument, Mayo seemed to contend that some of the information IGS presented as trade secret information did not in fact constitute trade secret information because it was shared freely among different actors within the industry. He made these assertions, however, only in the context of argument and, as discussed, presented no evidence to counteract IGS's overwhelming evidence that the information that had been copied onto the USB Drive constituted confidential trade secret information.

16

profit margins," and some of which "IGS does not have other copies." (Compl. ¶¶ 45, 47.) Furthermore, IGS presented evidence, via its Verified Complaint, that "Mayo secured employment with a direct competitor of IGS," (Compl. ¶ 53). Mayo produced nothing to rebut this evidence. The evidence of Mayo's employment with a direct competitor, combined with the evidence that Mayo "accessed, copied[,] and deleted IGS's confidential, proprietary[,] and trade secret information while seeking employment with a competitor of IGS," (Compl. ¶ 54), satisfies the requisite clear showing of actual and imminent irreparable harm given the "possibility of permanent loss of customers to a competitor." *See MultiChannel TV*, 22 F.3d at 552.

### D. The Balance of Equities and the Public Interest Favor Granting an Injunction

Considering the facts before the Court, the balance of equities tips heavily in favor of granting IGS a preliminary injunction. If, as the Confidentiality Agreement states, Mayo is contractually barred from using any of the trade secret information except "in connection with his work for" IGS, (Confidentiality Agreement 1, ECF No. 1-1), then Mayo has no legitimate interest in possessing IGS's trade secret information, and he loses nothing if the injunction is granted. IGS, on the other hand, faces irreparable injury if Mayo discloses its trade secrets. *See, e.g., Home Funding Grp., LLC v. Myers*, No. 1:06cv1400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) ("The disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'") (quoting *Acierno v. New Castle Co.*, 40 F.3d 645, 647 (3d Cir. 1994)). Further, "'[p]ublic interest favors the protection of confidential business information and the enforcement of valid contracts.'" *Audio-Video Group, LLC v. Green*, No. 1:14cv169, 2014 WL 793535, at *5 (E.D. Va. Feb. 26, 2014) (quoting *ABT, Inc. v. Juszcyk*, No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010)) (alteration in original).

Thus, considering the legitimate interests at stake, the balance of equities and the public interest both warrant granting IGS a preliminary injunction.

### III. Conclusion

For the foregoing reasons, the Court granted IGS's Motion for Preliminary Injunction. An appropriate order has issued. (*See* ECF No. 19.)

Let the Clerk send a copy of this Memorandum Opinion and the accompanying Order, (ECF No. 19), to all counsel of record.

It is so ORDERED.

/s/ M. Hannah Lauck
United States District Judge

Date: 9/13/17
Richmond, Virginia